UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| RICHARD S. GRIFFIN and GRIFFIN FARM & LANDFILL, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:05-cv-514-RJC |
| TOWN OF UNIONVILLE, NORTH CAROLINA, | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM AND ORDER RE: SUMMARY JUDGMENT MOTIONS**

This civil action for monetary, declaratory and specific relief arises out of a local land-use dispute. The gist of the plaintiffs' claims is that they obtained zoning approval for an "industrial solid waste landfill" by obtaining a Special Use Permit ("SUP") and that by spending money in reliance on the SUP they obtained a "vested right" to build and operate their proposed facility. Therefore, the plaintiffs contend, since they have met all other statutory requirements, the Town of Unionville violated their due process rights under U.S. Constitution and breached their common law vested right derived from their SUP by refusing to amend its existing Solid Waste Franchise to allow the plaintiffs to operate their proposed facility. In addition to monetary damages, the plaintiffs also ask that the Court declare that Town's acts and its Franchise Ordinance are unconstitutional, and that the Franchise Ordinance is void; amend the Town's Franchise Ordinance, and grant a declaratory judgment as to the validity and limits of the Special Use Permit. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157, 1334, and 1367.

Presently before the Court are the parties' cross-motions for summary judgment. Having

1

reviewed the parties' submissions and heard oral argument, the Court finds that the record demonstrates that the plaintiffs do not have a property interest in their proposed industrial solid waste landfill: not only do the plaintiffs misunderstand the scope of the 1997 Special Use Permit, but such a permit is only one of the three authorizations that were needed for an industrial solid waste landfill. Furthermore, the Court finds that there is no constitutional infirmity in the Town's ordinance. The reasons for the Court's conclusions follow, beginning with the following material and undisputed facts.

## I. UNDISPUTED FACTS[1]

Richard Griffin is the sole shareholder of Griffin Farm and Landfill, Inc. ("GFL") (collectively referred to as "plaintiffs"). Griffin owns three contiguous parcels of property designated on Tax Maps 08-138-01, 08-135- 07, and 08-135-08 (the "Property") in Union County, North Carolina.

*The Plaintiffs' Early Landfills*

From 1992 to 1994, Griffin operated a then-called "demolition landfill" on a small portion of the Property pursuant to a permit issued by the Union County Health Department which authorized the landfill to accept wastes restricted to "stumps, limbs, leaves, concrete, brick, untreated wood, asphalt, uncontaminated earth, and or rocks." (J.E. 3) Today, this type of landfill is considered an LCID landfill.[2]

---

[1] The following undisputed facts are adopted from the parties proposed Joint Statement of Stipulated Facts (Doc. No. 53), with citations to the parties' Joint Exhibits ("J.E.").

[2] The Solid Waste Management Rules define a "demolition landfill" as "a sanitary landfill that is limited to receiving stumps, limbs, leaves, concrete, brick, wood, uncontaminated earth or other solid wastes as approved by the Division" and a "land clearing and inert debris landfill" as "a facility for the land disposal of land clearing waste, concrete, brick, concrete block, uncontaminated soil, gravel and rock, untreated and unpainted wood, and yard trash." 15A N.C. Admin. Code 13B .0101(4) and (54). Effective January 4, 1993, the Rules repealed certain special provisions for "demolition landfills." See 15A N.C. Admin. Code 13B .0506-.0507. Thus, the definition of an LCID

On December 28, 1993, the Union County Board of Commissioners passed a Resolution granting the plaintiffs "prior approval" to expand their landfill operation to include a "Construction and Demolition" ("C&D") landfill in connection with their application to the State for a permit to operate such a landfill. (J.E. 3; see also J.E. 2 ("Sullivan Depo.") at 17-18).

On September 29, 1995, the state issued GFL a permit to construct and operate a C&D landfill; the permit subsequently was amended on November 19, 1998, and again on March 23, 2005. The State's 1998 amendment to the permit was done at a time when the plaintiffs had no landfill franchise. (See J.E. 5 ("Griffin Aff.") at ¶¶ 4, 6).

Both the original permit and the amended permits authorize the plaintiffs' landfill to receive the following types of waste:

a. Land-clearing debris as defined in G.S. 130A-290, specifically, solid waste that is generated solely from land-clearing activities, such as stumps, trees, etc.;

b. Inert debris defined as solid waste that consists solely of material that is virtually inert, such as brick, concrete, rock and uncontaminated soil;

c. Asphalt in accordance with G.S. 130A-294(m); and

d. Construction and demolition debris defined as solid waste resulting solely from construction, remodeling, repair or demolition operations on pavement, buildings, or other structures.

These permits, which continue through the present, expressly prohibit the plaintiffs' landfill from accepting "municipal solid waste" or "industrial waste," and did not approve "construction and demolition like waste . . . from industrial sources . . . ." (J.E: 6: Solid Waste Permit at 85-86; J.E.7 ("Griffin Depo.") at 17).


*The Plaintiffs' 1997 Special Use Permit ("SUP")*

---

landfill now subsumes the prior definition of a "demolition landfill." See id.

On January 6, 1997, the Union County Board of Commissioners adopted a motion to approve an application by the plaintiffs to expand their C&D landfill. (J.E. 8). At this time, under the County's Land Use Ordinance, the plaintiffs' LCID and C&D landfills were permitted uses as a matter of right in the RA40 zoning district where the Property was located, so long as the plaintiffs had a valid permit from the County's Health Department and from the State. (J.A. 9 at 11 & 14). Later that summer, however, the Land Use Ordinance was amended to require that, along with maintaining a valid permit from the Health Department and the State, all "Demolition Landfills" for off-site waste disposal located in an RA40 district must be issued a special use permit by the Board of Adjustment after a hearing. (See Griffin Depo. at 22).

At that time, the County's Land Use Ordinance defined "Demolition Landfill," in pertinent part, as follows:

> An operation which consists of the dumping of materials allowed in a reclamation landfill and/or construction material consisting of debris associated with the construction or demolition of housing or buildings. In no event shall such debris include solvents, chemicals, paint, asbestos, or any industrial, infectious or hazardous substance . . . .

(J.E. 9 ("Ordinance") at 8 (the relevant language of the 1997 Land Use Ordinance was the same as the language in the 1994 Ordinance, except for the table of uses), Griffin Depo. at 53-54).

Section 54(c) of the County's special use permit regulations provides that:

> Even if the board of adjustment finds that the application complies with all other provisions of this ordinance, it may still deny the permit if it concludes, based upon the information submitted at the hearing, that if completed as proposed, the development, more probably than not:
>
> (1)      Will materially endanger the public health or safety; or
> (2)      Will substantially injure the value of adjoining or abutting property; or
> (3)      Will not be in harmony with the area in which it is to be located; or

(4)     Will not be in general conformity with the land development plan, thoroughfare plan, or other plan officially adopted by the Board.

In light of this new special use permit requirement, and because they were seeking at the same time an amended permit from the State to expand their C&D and LCID landfill operations and were required to demonstrate to the Division of Waste Management that their landfill had the requisite zoning approval from the County, the plaintiffs applied for a special use permit "for the construction and operation of a state approved demolition landfill."[3] The application included all three tax parcels of the Property. (J.E. 10: Oct. 24, 1997 SUP Application; Griffin Depo. at 22 & 26-27).

On November 3, 1997, the Board of Adjustment, after conducting a hearing, granted the plaintiffs' special use permit application. (J.E. 12 ("SUP"); J.E. 11: Minutes of Nov. 3 Hearing). The Special Use Permit issued to the plaintiffs provided the following:

> Having heard all the evidence and arguments presented at the hearing, the Board of Adjustment finds that the application is complete, that the application complies with all the applicable requirements of the Union County Land Use Ordinance for the development proposed, and that therefore the application to make use of the above described property for the purpose indicated is hereby approved, subject to all applicable provisions of the Union County Land Use Ordinance and the following conditions:

> 1)     The applicant shall complete the development strictly in accordance with the plans submitted to and approved by this Board, a copy of which is filed with the Administrator. Any deviations from or

---

[3] Landfills in North Carolina are regulated under Article 9, Chapter 130A of the North Carolina General Statutes and by the Solid Waste Management Rules of the Department of Environment and Natural Resources codified in Subchapter 13B, Title 15A of the North Carolina Administrative Code. These regulations require that, in order to construct and operate a sanitary landfill, a landfill owner must obtain (1) zoning approval from the local government having jurisdiction over the land on which the landfill is to be located; (2) a franchise ordinance and franchise from the local government to authorize the particular landfill (except for LCID landfills); and (3) a State permit, which is reviewed every five years. See N.C. Gen. Stat. § 130A-294(b1)(3), (4) (2003); 15A N.C. Admin. Code 13B .0201 and .0504(1)(e). N.C. Gen. Stat. § 130A-294 was amended in various respects in 2006 by Session Laws 2006-256, ss. 1through 3, effective August 23, 2006. The version of § 130A-294 applicable to this case, and to which all cited statutes refer, is the one that was in existence through 2005 and last amended in 2003.

changes in these plans must be pointed out
specifically to the Administrator in writing and specific written
approval obtained as required by Section 64. . . .

Section 64 of the Land Use Ordinance, referenced in the SUP, provides for amendments to

and modifications of special use permits as follows:

(a)     Insignificant deviations from the permit (including approved plans) issued by the planning board, the board of adjustment, or the administrator are permissible and the administrator may authorize such insignificant deviations.  A deviation is insignificant if it has no discernible impact on neighboring properties, the general public, or those intended to occupy or use the proposed development.

(b)     Minor design modifications or changes in permits (including approved plans) are permissible with the approval of the permit issuing authority.  Such permission may be obtained without a formal application, public hearing, or payment of any additional fee. For purposes of this section, minor design modifications or changes are those that have no substantial impact on neighboring properties, the general public, or those intended to occupy or use the proposed development.

(c)     All other requests for changes in approved plans will be processed as new applications. If such requests are required to be acted upon by the board of adjustment, new conditions may be imposed in accordance with Section 59, but the applicant retains the right to reject such additional conditions by withdrawing his request for an amendment and may then proceed in accordance with the previously issued permit.

(d)     The administrator shall determine whether amendments to and modifications of permits fall within the categories set forth above in subsections (a), (b), and (c).

(e)     A developer requesting approval of changes shall submit a written request for such approval to the administrator, which request shall identify the changes.  Approval of all changes must be given in writing.

(Land Use Ordinance at 51-52).

After the plaintiffs received their Special Use Permit in 1997, they did not apply to the

County Zoning Administrator for any amendment or modification to that permit. (Griffin  Depo. at

50-52).

In connection with the issuance of their SUP, Mr. Griffin retained Municipal Engineering

6

Services ("MES" ) in 1997 to perform work on the Property. (J.E. 13 ("Sullivan Aff.") at ¶¶ 4-6, 15).

On June 8, 1998, the plaintiffs proposed that the County amend its definition of "Demolition Landfill" in the Land Use Ordinance to allow for the disposal of "industrial solid waste." (See J.E. 14: Minutes of County's Planning Board June 8, 1998 Meeting; Griffin Depo. at 54-57). The proposed amendment reads as follows:

> Landfill, Demolition.   An operation which consists of the dumping of materials allowed in a reclamation landfill and/or construction material consisting of debris associated with the construction or demolition of housing or buildings, and Industrial Solid Waste as defined in the ENR-Division of Waste Management Regulations effective January 9, 1997.   In no event shall such debris include solvents, chemicals, asbestos, food or food by-products or any infectious or hazardous substance. . . .

The Planning Board voted to recommend the amendment to the Union County Board of Commissioners.  And on July 6, the Board of Commissioners adopted the proposed definition of "Demolition Landfill." (See J.E. 15: Minutes of July 6 Commissioners' Meeting and Text Amendment to Land Use Ordinance).

*Plaintiffs Apply For A State Permit For An Industrial Solid Waste Landfill And Ask Union County For A Franchise Ordinance And Franchise For Their Landfills*

After the definition amendment, Mr. Griffin had MES continue to work on the Property by preparing a soil and sedimentation erosion control plan and topographical maps, installing piezometers around the Property, and preparing a site hydrogeologic study.  Mr. Griffin paid in excess of $200,000 for this work over an approximately four year period. (Sullivan Aff. at ¶¶ 12, 15-16 & 20).

In July 1999, the plaintiffs submitted to the State a "Permit Application [for] Griffin Farms Industrial Solid Waste Landfill;" and in November 2000, they submitted the "Site Hydrogeologic

Study." (Sullivan Depo. at 62-68 & 73-78). Taken together, these submissions were intended to provide the State with information to satisfy the siting, design, application, and operational requirements necessary for obtaining a permit to operate an industrial solid waste landfill on those portions of the Property not being used for the plaintiffs' existing C&D and LCID operations. (Id.) On February 19, 1999, the State issued a letter of approval for the plaintiffs' erosion and sedimentation control plan. (J.E. 16).

On or about August 16, 2000, Griffin's engineer from MES (Sullivan) met with the State in regard to a request from the State to expound on data submitted with the application. (Sullivan Aff. at ¶ 17).

On September 12, 2001, the State wrote the plaintiffs a letter about their permit application for an industrial solid waste landfill. (J.E. 18).[4]

In light of the State's September 12, 2001 letter, the plaintiffs attempted to obtain from Union County "a Construction and Demolition Debris and Industrial Waste Disposal Franchise Ordinance and Agreement pursuant to N.C. General Statute. § 130A-294(b1)(3)." (See Griffin Depo. at 71-72; J.E. 19: Letter from Plaintiffs' Counsel to Union County's Board of Commissioners).[5] Prior to that time, the County had not enacted a franchise ordinance to authorize franchises for any type of

---

[4] The letter informed the plaintiffs that: "Solid Waste Rules and North Carolina General Statues required local government approval for landfills other than LCID landfills. [GFL] is of the type requiring local government approval. In addition North Carolina general Statute 130A-294(b1)(3) and (4) requires that the applicant obtain a franchise from the local government. The ordinances enabling local government franchising can be found in North Carolina General Statute 153A-136 or 160A-319 depending [on] if the local government is a county or municipality. The requirements of 130A-294(b1)(3) and (4) must be met before site suitability can be issued." (J.E.18)

[5] The letter informed the plaintiffs that "All landfill operators in North Carolina are required by law to obtain a permit from the State of North Carolina for the operation of a landfill facility" and that "a franchise ordinance is required for all landfill facilities except [LCID] landfills;" and furthermore, that "[i]n order for any sanitary landfill facility to obtain a new permit, to renew a permit, or amend its current permit, the county in which it is located must now adopt a franchise ordinance and grant to the landfill[] a franchise pursuant to the ordinance." (J.E.19) Finally, the letter stated that "Griffin Farms currently accepts construction and demolition debris and land clearing and inert debris." (Id.)

sanitary landfill. On December 17, 2001, the Board of Commissioners passed a motion to approve the first reading of a "Construction and Demolition Debris Disposal Franchise Ordinance." (J.E. 20). No franchise ordinance was adopted, however, and no franchise agreement was entered into between the plaintiffs and the County. (See Griffin Depo. at p. 72).

*The Town Becomes An Incorporated Municipality and later Grants Plaintiffs A Franchise Ordinance And Franchise Agreement To Operate Their C&D And LCID Landfill*

In November 1998, the corporate charter of the Town was revived so that it became an incorporated municipality in the State. In 1999, the Town's boundaries were expanded by a local bill passed by the General Assembly (Session Law 1999-90) to include, inter alia, the Property. From February 11, 1999, until October 1, 2003, when the Town adopted its own Land Use Ordinance, the Town conferred jurisdiction upon the County to exercise within the Town's limits all zoning and other powers enumerated in Article 19 of Chapter 160A of the North Carolina General Statutes. (J.E. 21 & 22).

In December 2002, the plaintiffs' engineer (Sullivan) wrote a letter to the state which requested that the plaintiffs "be permitted to expand [their] construction and demolition landfill." (J.E. 23).[6] The State responded by a letter dated January 13, 2003. (J.E. 24).[7]

---

[6] In pertinent part, Sullivan's letter reads as follows:

I am writing pursuant to our meeting on the 10th of December 2002, concerning franchise issues with the above referenced landfill. Griffin Farms was granted a permit to operate a demolition landfill (Land Clearing and Inert Debris) by Union County in 1993. As we discussed, the Solid Waste Section permitted the Griffin Farms Construction and Demolition Landfill on September 29, 1995 . . . . At the time of the permit, the landfill was in the jurisdiction of Union County, and there was no local government approval. However, on January 6, 1997, Griffin Farms obtained approval . . . from the Union County Board of Commissioners to expand the landfill onto tax map parcel 8-138-1. Furthermore, on November 13, 1997, a Special Use Permit . . . was obtained from Union County for tax parcels 8-135-7 and 8, which included permitted phases 1 and 2, and 8-138-1 for use as a construction/demolition landfill.

In 1999, the community of Unionville re-incorporated, and the new town limits included the parcels that have been permitted for a construction and demolition landfill. At the present time, the Town relies on the zoning ordinances of Union County. However, if a subsequent franchise must be issued, it will have to be

9

At the March 17, 2003 regular meeting of the Town Council, the plaintiffs requested that the Town adopt "a franchise ordinance to allow Mr. Griffin to continue to operate his C&D [and] LCID landfill . . . ." (J.E. 15). At that time, the plaintiffs did not request a franchise ordinance and franchise to operate an industrial solid waste landfill. (See J.E. 25: Minutes of March 17 Meeting). The plaintiffs, through their counsel at the time, participated in the drafting of the ordinance and commented on it at a public hearing on April 21, 2003. (See J.E. 26: Plaintiffs' Response to Request for Admissions, Request No. 23; J.E. 27 & 28).

On June 16, 2003, the Town Council unanimously adopted a "Solid Waste Franchise Ordinance for the Town of Unionville, North Carolina." (J.E. 29). On November 17, 2003, the Town Council unanimously approved a second reading of the Franchise Agreement between the Town and GFL, and the Agreement was ultimately executed by the parties on February 9, 2004. (J.E. 30: Minutes of Nov. 17 Meeting; J.E. 31 ("Franchise Agreement")).

*The Town Confirms That Plaintiffs' SUP From The County Allows Their Current*

---

done by the Town of Unionville. In summary, Griffin Farms had obtained all of the local government approvals required when the permit was issued for Phases 1 and 2. Since that time, Griffin Farms has obtained from the local government, with the jurisdiction at the time, local government approval in the form of a Special Use Permit issued by Union County for the use of three tax parcels to be used as a construction and demolition landfill. Furthermore, the Union County Board of Commissioners approved the expansion of the construction and demolition landfill in 1997 — two years prior to the re-incorporation of Unionville — to include a third parcel owned by Griffin Farms, but it is not permitted at this time for construction and demolition.

Moreover, if the County or the Town does not presently have an ordinance requiring Griffin Farms to obtain a franchise, it appears that neither the Town nor the County should have to pass an ordinance that they may or may not want; the ordinance should have to be on the books prior to any submission by Griffin Farms.

Consequently, we are requesting that Griffin Farms be permitted to expand the construction and demolition landfill onto at least Phase 1 and 2 that was permitted in 1995. . . .

(J.E. 23)

[7] The June 13, 2003 letter stated that "the Section has determined that a local government franchise is required in order to allow the Section to issue any subsequent permits for this facility. Based on our discussion [] it appears that a franchise should be issued by Unionville." (J.E. 24)

*Operations.*

The Town's Land Use Ordinance became effective on October 1, 2003. (J.E. 32 ("Land Use Ordinance")).  Under the Ordinance, the definition for "Demolition Landfill" was the same as Union County's amended 1998 definition, which included the disposal of materials allowed in a reclamation landfill, demolition and construction debris and "Industrial Solid Waste as defined in the ENR-Division of Waste Management Regulations effective January 9, 1997." (Land Use Ordinance at 26-27).  Like the County's Ordinance, the Town's Land Use Ordinance required that all landfills for off-site waste disposal located in the RA40 district must be issued a special use permit by the Town's Board of Adjustment after a hearing.  In addition, the provisions governing the criteria by which the Board of Adjustment could issue special use permits (Section 54(c)) and the procedures for amending and modifying such permits (Section 64) were identical to those contained in the County's Ordinance.

In early February 2004, a few days after the Town and GFL executed their Franchise Agreement, Griffin contacted the Town's Land Use Administrator, William E. Pugh, to ask whether the Town would recognize the Special Use Permit that Union County had issued to the plaintiffs in 1997. (Griffin Depo. at 88-89).  In connection with his inquiry, Griffin faxed Pugh a copy of a November 13, 1997 letter from the County which stated that the plaintiffs' special use permit application had been approved, along with a copy of a page from the Franchise Agreement and a map that depicted the Property. (See id. at 98-100; J.E.33).

Pugh responded to Griffin's inquiry by a letter dated February 13, 2004, which acknowledged that the plaintiffs have those rights conferred by their 1997 Special Use Permit. (J.E. 34).[8]

Mr. Griffin subsequently submitted a copy of this letter and the Franchise Agreement to the State; and on March 23, 2005, the State issued GFL an amended permit for the continued operation of its C&D Landfill. (J.E. 6: Amended Permit; Griffin Depo. at 91).

> *Plaintiffs Ask The Town To Amend Its Franchise Ordinance And Grant Them An Additional Franchise To Operate an Industrial Solid Waste Landfill*

On June 10, 2005, Griffin's counsel wrote a letter to the Town's mayor to request an amendment to the Franchise Ordinance and an additional franchise to construct and operate an industrial solid waste landfill. (J.E. 35). The letter enclosed an "Application for a Franchise to Operate an Industrial Solid Waste Landfill."[9]

At a regular Town Council meeting on July 18, 2005, the Council formally received Mr. Griffin's request for an amendment to the Franchise Ordinance and for a new franchise for an industrial solid waste landfill, and established a Subcommittee of two Council members to meet with Griffin's representatives and make a recommendation to the full Council about the proposal. (See

---

[8] Specifically, Pugh's letter said:

This letter is to advise you that the Town of Unionville recognizes your Special Use Permit to operate a demolition landfill at 4242 Morgan Mill Rd., tax maps 08-130-01, 08-135-07, and 08-135-08, as approved by the Union County Board of Adjustment on November [1]3, 1997.

The property is in the Unionville RA-40 zoning district, in which Demolition Landfills and Reclamation Landfills are allowed as Special Uses. Such landfills permit the disposal of Land Clearing and Inert Debris, Construction and Demotion Waste and Non-Hazardous Industrial Waste as defined by DENR Division of Waste Management regulations.

The use may continue to be conducted in accordance with the specifications and conditions of the Special Use Permit approved by Union County, however, any changes from that permit would require approval of a permit amendment by the Town of Unionville Board of Adjustment.

(J.E. 34).

[9] Griffin's letter stated that "GFL, however, would prefer to continue its operation of only the C&D and LCID landfill on the Site, and to Operate a Demolition Landfill on the remaining Tax Map Property. As a result, GFL is requesting an amendment to the Town's Solid Waste Franchise Ordinance and an additional franchise to allow GFL to operate a Demolition Landfill as outlined in the enclosed Application for a Franchise [] and a Permit Application []." (J.E. 35).

J.E. 36: Minutes of July 18 Meeting). In advance of the subcommittee's meeting, the Town's counsel emailed plaintiffs' a list of some matters that Griffin ought to address at the subcommittee's forthcoming meeting. (J.E. 37).

On August 15, 2005, the subcommittee held a special meeting, which was open to the public. Later that evening, the Town Council met in regular session to consider the information provided earlier. (See J.E. 38 & 39: Minutes of Aug. 15 Regular and Special Town Meetings).

On August 19, 2005, the Town's counsel emailed the plaintiffs' counsel a list of various requests for information. (J.E. 40). The plaintiffs' counsel responded to the Town's request by letter dated September 12, 2005. (J.E. 41).

On September 19, 2005, the Town Council held another public meeting on Griffin's request to amend the Franchise Ordinance and for a new franchise. The Council adopted a motion "to make no changes to the existing Franchise Ordinance at this time." (J.E. 42: Minutes of September 19 Meeting).

On May 15, 2006, upon the recommendation of the Town's Planning Board and after a public hearing, the Town Council adopted a text amendment to the use-category definition of "Landfill Demolition" in the Town's Land Use Ordinance, which amendment deleted from the definition the phrase "Industrial Solid Waste as defined in the ENR-Division of Waste Management Regulations effective January 9, 1997." (J.E. 43).

## II. PLAINTIFFS' COMPLAINT

Originally the plaintiffs each filed voluntary petitions under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Western District of North Carolina. The Court withdrew the reference pursuant to 28 U.S.C. § 157(d) because, inter alia, resolution of the proceeding requires consideration of the plaintiffs' claims for violation of the due process and equal protection clauses of the U.S. Constitution. (See Doc. Nos. 1 & 2).

As it now stands, Count One of the plaintiffs' thrice-amended Complaint alleges that their substantive due process rights under the Fourteenth Amendment to the United States Constitution were violated by the Town's failure to amend its Franchise Ordinance to authorize a franchise for Plaintiffs to operate an industrial solid waste landfill. (See First Amended Complaint at ¶¶ 53-58).[10] The plaintiffs ask that the Court declare that the Franchise Ordinance and Defendant's acts are unconstitutional, and the Franchise Ordinance is void in Count Three. (Id. at ¶ 67).

Count Four alleges that "Defendant's acts in refusing to amend the Franchise Ordinance, and, de facto, denying Plaintiffs the ability to operate a Demolition Landfill [breached] Plaintiffs' common law vested right to construct and operate the Demolition Landfill." (Id. at ¶ 73).

Finally, Count Five seeks "a decree of specific performance for Plaintiffs to operate a Demolition Landfill on the Proposed Landfill Property in accordance with NCDENR regulations" (First Amended Complaint at ¶ 81); while Count Six seeks a "declaratory judgment as to the validity and limits of the Special Use Permit, and a declaratory judgment that Plaintiffs are entitled to act in accordance with their rights under the Special Use Permit" (Second Amended Complaint at ¶ 67).

---

[10] This claim can only be brought pursuant to 42 U.S.C. § 1983, though the plaintiffs do not specifically plead the statute.

### III. CROSS-MOTIONS FOR SUMMARY JUDGMENT

Now pending before the Court are the parties' cross-motions for summary judgement.

1.      Claims One and Four

To establish a § 1983 claim based on a violation of substantive due process, the plaintiffs must first show that they had a property interest that was deprived by the violation. <u>Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach</u>, 420 F.3d 322, 328 (4th Cir. 2005); <u>Sylvia Dev. Corp.</u>, 48 F.3d at 827 (citing <u>Love v. Pepersack</u>, 47 F.3d 120, 122 (4th Cir.1995)); <u>McDonald's Corp. v. Dwyer</u>, 450 S.E.2d 888, 890 (N.C. 1994). "To demonstrate a property interest under the Fourteenth Amendment, a party must show more than a mere expectation; he must have a legitimate claim of entitlement." (<u>Dwyer</u>, 450 S.E. 2d at 890. In this case the plaintiffs argue that they obtained a "vested right" to build and operate an industrial solid waste landfill, and since they have met all other statutory requirements, they had a  constitutionally protected interest in having the Town grant a franchise for their landfill.

Whether the plaintiffs possessed a legitimate claim to a franchise for an industrial solid waste landfill turns on whether (1) they have made substantial expenditures; (2) their expenditures were made in good faith; (3) their expenditures were made in reasonable reliance on and after the issuance of valid governmental approval; and (4) they would be harmed by a change in governmental requirements. <u>Browning-Ferris Indust., Inc. v. Guilford County Bd. of Adjustment</u>, 484 S.E.2d 411, 414-15 (N.C. App. 1997).

The plaintiffs' vested rights claim is that they spent approximately $750,000 in connection with applying to the State for a permit for an industrial solid waste landfill after relying upon (1) the 1997 Special Use Permit issued by Union County, (2) the County's 1998 text amendment allowing

industrial solid waste landfills, and (3) Pugh's 2004 letter advising the plaintiffs that the Town would recognize their 1997 Special Use Permit. They allege that, by virtue of these authorizations, "Plaintiffs received specific and valid approvals from Union County and Defendant to construct and operate a[n] [industrial solid waste] Landfill." (First Amended Complaint at ¶ 69).

In this case, the parties agree that the plaintiffs have made substantial expenditure. With regard to the remaining prongs, submissions by the parties and oral argument have narrowed the issues to these:

i. Did the plaintiffs' 1997 SUP give them proper zoning to build and operate industrial solid waste landfill?

ii. Assuming that the plaintiffs had a proper zoning permit, were the plaintiffs' expenses made in good faith, and made on reasonable reliance on and after the issuance of valid governmental approval?

Based on the record in this case, the Court concludes that the plaintiffs' 1997 SUP did not give them a zoning permit for an industrial solid waste landfill. Even assuming that they did have a proper SUP, however, the plaintiffs have never obtained any of the other authorizations for an industrial solid waste landfill that are required by North Carolina law. Therefore, they cannot have spent money in good faith or in reasonable reliance on their SUP, and cannot have a vested right to such a landfill. Furthermore, even assuming that the plaintiffs did have a vested right in their SUP, North Carolina law clearly and unequivocally states that they must also obtain a franchise from the Town to operate an industrial solid waste landfill. Zoning approval cannot substitute for the franchise.

Therefore, the Court finds that plaintiffs' due process and breach of vested rights claims must fail.

2.      Claim Three

The plaintiffs contend that the Town's Franchise Ordinance deprived them of a property interest because the Ordinance is "beyond the limits of legitimate government authority," specifically because it provides that the Town Council "may grant a franchise upon terms acceptable to the Town Council," and that "[t]he Town Council may deny a franchise in its sole discretion." (First Amended Complaint at ¶¶ 62-63).

Assuming that the plaintiffs may challenge the existing Ordinance in this case, the plaintiffs are incorrect: the above-reference language is nothing more than an accurate statement of North Carolina Law.  Therefore, the Court finds no constitutional infirmity in the Town's franchise ordinance.

A.      **The Plaintiffs' 1997 SUP Constitutes Zoning Approval for Only a C&D and LCID Landfill**

The plaintiffs' 1997 SUP does not authorize them to operate an industrial solid waste landfill, even after Union County changed its definition of "Demolition Landfill" in 1998.

First the Special Use Permit is limited by its own terms to those uses presented to the County in obtaining it. See Westminster Homes, Inc. v. Town of Cary Zoning Bd. of Adjustment, 554 S.E.2d 634, 638 (N.C. 2001) ("The only use which can be made of the land which is conditionally rezoned is that which is specified in the [Special Use] permit").  The record in this case reflects that the only uses and plans presented to the County when requesting the SUP were those related to the plaintiffs' C&D and LCID operations.  Griffin specifically represented to the Board of Adjustment that his landfill would be used to dispose of "construction and demolition" waste only.  He also told the Board that his C&D landfill operated under a valid State permit for a C&D landfill and that no

"liner" was required to contain the waste (as would have been required for Griffin's proposed industrial solid waste). In addition, Griffin's engineer, in a 2003 letter to the State (in connection with renewing the plaintiffs' State permit for their C&D landfill) represented that the SUP was obtained to secure the County's approval only for the plaintiffs' existing and expanded C&D landfill.

Second, the 1997 SUP – which authorized "the construction and operation of a State-approved demolition landfill" – could not have authorized the receipt of such industrial waste since it was issued at a time when Union County's Land Use Ordinance expressly prohibited landfills from disposing of industrial solid waste.

Finally, although the plaintiffs' SUP explicitly incorporates specific amendment procedures prescribed in Section 64 of the Union County Land Use Ordinance, they were not followed. The SUP specifically required that any deviations from or changes in these plans "must be pointed out specifically to the Administrator in writing and specific written approval obtained as required by Section 64." The plaintiffs, however, never applied to the County's or the Town's Land Use Administrator for any amendment or modification to the SUP so that they could operate an industrial solid waste landfill after the ordinance was changed in 1998. The plaintiffs therefore never obtained the right to conduct any operations other than those specifically presented to the County in 1997. See Westminster Homes, Inc., 554 S.E.2d at 638.

Nor does the Court find that the plaintiffs' 1998 request for a text amendment to the definition of "Demolition Landfill" satisfies the requirement to amend the SUP. (See Plaintiffs' Brief at 27-28). That Union County later passed a text amendment to their Land Use Ordinance did not convert the plaintiffs SUP into one that authorized them to operate an industrial solid waste landfill.

18

Moreover, the discussions in 1998 did not constitute a formal amendment of the plaintiffs' permit. First, the provisions of Section 64 of the Ordinance to amend an SUP requires the approval of the zoning administrator or the Board of Adjustment, neither of which were involved in the 1998 text amendment. Second, during the June 8, 1998 Planning Board meeting at which the text amendment to the Land Use Ordinance was first discussed, the Chairman of the Board specifically stated that the amendment did not mean that industrial solid waste landfills could be operated in the County as a matter of absolute right because "the Board of Adjustment reviews all off-site demolition landfills as a special use permit." Third, there is no evidence that the plaintiffs submitted any new plans that included industrial solid waste. Finally, at no time did the County make any findings about whether an industrial solid waste landfill would satisfy any of the special use permit conditions set forth in Section 54(c) of the County Ordinance.

Therefore, as a matter of law, the text amendment in 1998 did not effect an amendment to the SUP, and the plaintiffs otherwise never obtained a new or amended SUP to operate an industrial solid waste landfill.

B.      **The SUP Was One Of Three Permits That Plaintiffs Needed To Build An Industrial Solid Waste Landfill**

Since 1994, three authorizations have been required to construct and operate an industrial solid waste landfill: (i) zoning approval, (ii) a local government franchise, and (iii) a permit from the State of North Carolina. N.C. Gen. Stat. § 130A-294(b)(1)(3) & (4); Session Laws 1993 (Reg. Sess. 1994), c. 722, ss. 1 and 2. As a matter of law, where multiple permits or governmental approvals are required for a project, a landowner has no vested right to complete that project unless he makes substantial expenditures in good faith reliance on and after receiving all requisite permits or other required approvals. For example, in PNE AOA Media, L.L.C. v. Jackson County, 554

S.E.2d 657 (N.C. Ct. App. 2001), the court held that an outdoor advertising company did not acquire a vested right to erect a billboard on a state highway in the county when the company made substantial expenditures prior to the issuance of a permit required from the North Carolina Department of Transportation (which had refused to issue a state permit after the county enacted a moratorium on outdoor advertising signs). 554 S.E.2d at 663. The court ruled that even though the company's expenditures were made at a time when no county sign permit was required and the "building permit" requirement was satisfied, they were not made in good faith reliance on valid governmental approval because they were not incurred after the company had obtained the required state permit. Id.

(1)     *The plaintiffs cannot have relied on the SUP in good faith to create a vested right to operate an industrial solid waste landfill*

In this case, even if the plaintiffs had obtained an SUP for an industrial solid waste landfill, they acquired no vested right to construct such a landfill because their expenditures were not incurred after obtaining both a franchise and a State permit for that type of landfill. They would have had at most the right to insist that neither the County nor the Town could withdraw zoning approval for the project, but this would not give them a vested right to complete the project in the absence of making substantial expenditures in reliance on and after receiving a requisite franchise and State permit. See Browning-Ferris Indus. of South Atlantic, Inc. v. Guilford County Bd. of Adjustment, 484 S.E.2d 411, 414 (N.C. Ct. App. 1997); David W. Owens, Land Use Law in North Carolina at 151 (2006) ("To the extent that a vested right can be secured at all for a 'partially' permitted project, it will apply only to the ordinances and the regulations for which permits have already been issued.").

The plaintiffs claim that Griffin "had no knowledge of any current or soon to be enacted law that would invalidate the rights given under the SUP" and that the State had never before required

a franchise. (Plaintiffs' Brief at 20). Despite, however, what the State might have actually required in the past, the plaintiffs were and are experienced landfill operators, with landfill operations dating back to 1992. They ought to have known that since 1994 North Carolina's statutes have unequivocally required that a landfill operator obtain both local land-use approval and a franchise. N.C. Gen. Stat. § 130A-294(b)(1)(3) & (4); Session Laws 1993 (Reg. Sess. 1994), c. 722, ss. 1 and 2. Indeed, since at least September 21, 2001, the plaintiffs indisputably knew from the State that they needed a franchise to operate their landfills. Indeed, they even obtained a franchise from the Town for their C&D and LCID operations in February 2004. The plaintiffs therefore cannot have had a good faith belief that their industrial solid waste landfill could definitely go forward absent a franchise and a State permit.

(2)     *The plaintiffs' claimed expenditures were not made in reasonable reliance on government approvals.*

The plaintiffs' claimed expenditures were not made in reasonable reliance on government approvals. Expenditures made by a landowner before the issuance of valid governmental approval, or in connection with seeking that approval, do not establish a vested right because such expenditures cannot be said to have been made "in reliance" on such approval. Warner v. W&O, Inc., 138 S.E.2d 782, 786 (N.C. 1964). In this case, because three approvals were required as a matter of law before the plaintiffs rights became vested, none of the plaintiffs' expenses incurred to obtain those approvals were in reasonable reliance for purposes of vested rights. Id.

This conclusion is even more compelling here with respect to the expenses that have been incurred before the plaintiffs obtained a franchise. N.C. General Statute § 130A-294(b1)(3) required that the plaintiffs must obtain a franchise before they applied for their State permit. Accordingly, they ought to have known that making substantial expenditures in preparing an industrial solid waste

permit application to the State before they had obtained a franchise from the local government was not sufficient. Despite this requirement, the plaintiffs spent the money identified in their brief before they even applied for a franchise from the Town in 2005; prematurely incurring all of these expenses established no vested right. See Kirkpatrick v. Vill. Council of Pinehurst, 530 S.E.2d 338, 344 (N.C. Ct. App. 2000) (owner of a nonconforming use who made expenditures related to a renovation and expansion of the nonconformity, with knowledge that a subsequent rezoning, special use permit, or other approval would be necessary for that activity, did not have the good faith necessary for a vested right); PNE AOA Media, 554 S.E.2d at 663 (developer who made expenditures to construct billboard, with knowledge that a State permit was also required, lacked the requisite good faith to obtain a vested right when expenditures were made before obtaining the State permit).

C.    **Plaintiffs Must Obtain a Franchise from the Town to Operate Their Proposed Industrial Solid Waste Landfill**

While the plaintiffs appear to contend that a franchise from the Town is not required (see Plaintiffs' Brief at 24 ("Even to the extent that there may have been a requirement to adopt a 'franchise ordinance' . . . .")), North Carolina law is clear that the plaintiffs must obtain a franchise from the Town before they can proceed with their industrial solid waste landfill.

> An applicant for a new permit . . . for a sanitary landfill shall obtain, prior to applying for a permit, a franchise for the operation of the sanitary landfill from each local government having jurisdiction over any part of the land on which the sanitary landfill and its appurtenances are located or to be located. A local government shall adopt a franchise ordinance under G.S. 153A-136 or G.S. 160A-319 prior to the submittal by an applicant of an application for a new permit.

N.C. Gen. Stat. § 130A-294(b1)(3).

Construing this statute together with the franchise statute under §§ 153A-136 and 160A-319, the North Carolina Court of Appeals held that a local government must pass an ordinance granting

a franchise before a person may operate a sanitary landfill. <u>County of Wake v. North Carolina Dept. of Env't & Natural Res.</u>, 573 S.E.2d 572, 585-86 (N.C. Ct. App. 2002), <u>review</u> <u>denied</u>, 579 S.E.2d 386 (N.C. 2003).

The plaintiffs also argue alternatively that the statutory mandate for obtaining a franchise does not apply because no franchise was required at all if the plaintiffs' SUP authorized an industrial solid waste landfill.

The Court, however, finds that the requirements in N.C. General Statute § 130A-294(b1)(3) and (4) are clear. Section 130A-294(b1)(3) mandates that an applicant for a State permit "for a sanitary landfill shall obtain . . . a franchise" and that "[a] local government shall adopt a franchise ordinance" prior to an application for a State landfill permit.[11] Section 130A-294(b1)(4) then mandates that the applicant for a State permit for a sanitary landfill "shall request . . . a determination as to whether the local government has in effect a franchise, zoning . . . or land-use planning ordinance applicable to the sanitary landfill and whether the proposed sanitary landfill . . . would be consistent with the applicable ordinances." The same Section adds that the State will not issue a permit "[u]nless the local government makes a . . . determination of consistency with all ordinances." <u>Id.</u> Similarly, the Solid Waste Management Rules in Subchapter 13B, Title 15A of the North Carolina Administrative Code require that an applicant for a State permit obtain "[a]n approval letter from the unit of local government . . . stating that the proposed facility meets all of the requirements of the local zoning ordinance." 15A N.C. Admin Code 13B .0202(a)(2) & .0504(1)(e).

These statutory provisions and administrative regulations, read together, plainly require that

---

[11] The language in subsection (b1)(3) that " [a] local government shall adopt a franchise ordinance under. . . G.S. 160A-319" was changed in a recodified subsection (b1)(2) to state that " [a] local government may adopt a franchise ordinance under . . . G.S. 160A-319." Session Laws 2006-256, ss. 1 through 3, effective August 23, 2006.

an applicant for a State permit for a sanitary landfill must obtain both (1) local land-use approval and (2) a local government franchise.  The plaintiffs' attempt to cast these requirements in the disjunctive or as being mutually exclusive not only contradicts the plain language of the statutory mandates but is counter to well-established canons of statutory construction.  See, e.g., Diaz v. Div. of Soc. Servs., 628 S.E.2d 1, 3 (N.C. 2006) (when language of statute is unambiguous, court has duty to give effect to the plain meaning of the statute); State v. Hollars, 626 S.E.2d 850, 852 (N.C. Ct. App. 2006) (portions of statute dealing with same subject matter are to be interpreted as a whole such that each "part of the law shall be given effect if this can be done by any fair and reasonable intendment"); Knight Pub. Co. v. Charlotte-Mecklenburg Hosp. Auth., 616 S.E.2d 602, 608 (N.C. Ct. App. 2005) (in the absence of contrary indication, it is presumed no word of any statute is a mere redundant expression, and each word is to be construed upon the supposition that the legislature intended to add something to the meaning of the statute); City of Concord v. Duke Power Co., 485 S.E.2d 278, 282 (N.C. 1997) (presumption is that no part of statute is mere surplusage, but that each part adds something which would not otherwise be included in its terms).  The North Carolina General Assembly clearly understood the differences in a land use ordinance and a franchise, and used both terms in the statute.  These terms are presumed to each have their own meaning and to not be surplusage.  Thus, under the plain language of applicable North Carolina law, the plaintiffs cannot are required to obtain a franchise before applying for a State permit.[12]

The plaintiffs also argue that "there is no real distinction between a franchise and a special

---

[12]  The plaintiffs argue that because the Town has not granted them a franchise for an industrial solid waste landfill, they are entitled to ignore the clear language of Section 130A-294(b1)(3).  They support this argument by focusing on N.C. General Statute § 130A-294(b1)(4), which requires that the local government confirm the existence of and consistency with franchise "or" land use ordinances.  The meaning of this requirement is that the local government must confirm, among other things, that Section 130A-294(b1)(3) has been complied with and that if there are applicable zoning ordinances, those have been complied with as well.  Were franchises optional, the Legislature would have written this statute very differently.

use permit." (Plaintiffs' Brief at 25).  This contention is unpersuasive.  Zoning is a restriction on the use of property and, conversely, permits certain uses of that property that are determined appropriate by the local government.  A special use permit, in particular, "is one issued for a use which the ordinance expressly permits in a designated zone upon proof that certain facts and conditions detailed in the ordinance exist." <u>Charlotte Yacht Club</u>, 307 S.E.2d at 597.  Such a permit does not constitute a private contractual right because "[t]he permit is not, and cannot be, personal to the applicant, but runs with the land." 3 Arden H. Rathkopf and Daren A. Rathkopf, <u>Rathkopf's The Law of Zoning and Planning</u>, § 61-50 at 61-136 (Edward H. Zeigler, Jr., ed. 2006).

A governmental franchise, on the other hand, is not simply a right to use land in a particular way, but constitutes "[a] special privilege conferred by [a] government on [an] individual or corporation" <u>Shaw v. City of Asheville</u>, 152 S.E.2d 139, 145 (N.C. 1967).  Thus, a franchise, unlike a special use permit, constitutes a contract that is personal to the franchisee and does not automatically run with the land.  In addition, "[t]he terms and conditions upon which [a franchise is] to be granted, unless clearly unreasonable or expressly prohibited by law, rest in the sound discretion of the local Board," <u>Mullen v. Town of Louisburg</u>, 33 S.E.2d 484, 488 (N.C. 1945), whereas the terms and conditions upon which a special use permit is to be granted are defined by the applicable land-use ordinance and are determined in a quasi-judicial proceeding based on substantial evidence in the whole record, <u>see</u> <u>Coastal Ready-Mix Concrete Co., v. B. of Comm'rs</u>, 265 S.E.2d 379, 383 (N.C. 1980), <u>reh'g</u> denied, 270 S.E.2d 106 (N.C. 1980).

Thus, a  franchise and an SUP are decidedly not the same sort of governmental approvals.  Franchises and zoning permits are authorized by separate and different statutes that confer different

powers for these very different kinds of approval.[13]  A franchise is a contract to engage in a public business granted by ordinance to a particular person through a legislative process.  A special use permit allows a land use based on a quasi-judicial determination under an existing zoning ordinance that applies to all similarly situated persons throughout the jurisdiction.

As a practical matter, it is also clear that the plaintiffs' SUP was never intended by anyone to be a franchise contemplated by N.C. General Statute § 130A-294(b1)(3) or N.C. General Statute § 160A-319 or § 153A-319.  For example, Section 130A-294(b1)(3) required at the time that a franchise granted for a landfill permit expressly include (i) a statement of the population to be served, including a description of the geographic area, (ii) a description of the volume and characteristics of the waste stream, and (iii) a projection of the useful life of the sanitary landfill.  Had the County intended that its SUP substitute for a franchise, it presumably would have included these requirements as conditions of the SUP.  It would also have included other terms that would be required for the operation of a public utility, including fees, operational requirements, an expiration date and a host of other requirements intended to serve the public interest.  The County did not do so, of course, because the SUP was not a franchise.

Nor could the plaintiffs themselves have intended that the SUP was a franchise.  The record demonstrates that they did not request a franchise or even mention the word "franchise" when applying for their SUP in 1997.  In fact, the only time that the record discusses a franchise is when

---

[13] The North Carolina General Assembly has conferred special powers upon counties and cities to grant franchises for sanitary landfills that are wholly different from the general zoning powers conferred upon counties under N.C. General Statute 153A-340(c1) and cities under N.C. General Statute § 160A-381(c) to grant special use permits.  A sanitary landfill is a public utility enterprise, see N.C. General Statute § 153A-274(3) and 160A-311(6), which both counties and cities are otherwise authorized to operate on their own, see N.C. Gen. Stat. § 153A-275 and 160A-312(a); and a franchise for a public utility enterprise is a contractual right given by a local government to an individual to engage "in [a] business of a public nature," Duke Power Co. v. Blue Ridge Elec. Membership Corp., 117 S.E.2d 812, 817 (N.C. 1961).

the plaintiffs (with their SUP already in hand) asked first the County and then the Town for a franchise; and therefore the plaintiffs clearly understood that their SUP was not and is not a franchise.

Moreover, the plaintiffs also knew that the State did not consider the SUP to substitute for a franchise. In 2002, they made to the State very similar arguments to those that they raise in their Brief, asking the State to forgo the franchise requirement for their C&D landfill in light of the SUP. The State flatly rejected this contention and required the plaintiffs to pursue a franchise from the Town for that C&D landfill.

In sum, the plaintiffs' contention that they have acted in "de facto" compliance with the requirements of N.C. General Statute § 130A-294 is wholly unsupported by any case law[14] and is entirely foreclosed by the "de jure" mandates of that statute which required that the plaintiffs obtain both local land-use approval and a franchise to operate an industrial solid waste landfill. They obtained neither, and therefore they have no basis upon which to claim any vested rights or property interest to support a constitutional challenge.

D.    **Assuming That Plaintiffs May Challenge the Existing Ordinance in this Case, the Ordinance is Merely an Accurate Statement of Well-Established Law.**

The plaintiffs contend that the Town's existing Franchise Ordinance violates their due process rights because it provides that the Town Council "may grant a franchise upon terms acceptable to the Town Council," and that "[t]he Town Council may deny a franchise in its sole

---

[14] The plaintiffs cite Town of Spencer v. Town of East Spencer, 522 S.E.2d 297, 301 (N.C. 1999) for the proposition that only "substantial compliance" with a statute is necessary. That case is inapposite here as it (a) involved the application of North Carolina's annexation statutes, and (b) made clear that non-adherence to an "essential element" of a statute precludes a finding of "substantial compliance." Thus, the plaintiffs' failure to obtain both local land-use approval and a franchise precludes any contention of "substantial compliance."

discretion."(Plaintiffs' Brief at 31-34). Their contention, however, fails for the following four reasons.

First, the plaintiffs have no standing to challenge the Town's Ordinance because they have not been injured by it. See Grace Baptist Church v. City of Oxford, 358 S.E.2d 372, 375 (N.C. 1987) ("in order to challenge the constitutionality of an ordinance, a litigant must produce evidence that he has sustained an injury . . . as a result of enforcement of the challenged ordinance"). The Franchise Ordinance applies solely to "C&D and/or LCID" landfills. Under it, the plaintiffs were granted a franchise to operate their C&D and LCID landfills, and they do not challenge any of the terms of the franchise that they received. Thus, the Franchise Ordinance itself caused no injury to the plaintiffs and could not be the proximate cause of any violation of their constitutional rights. See Horn v. Madison County, 22 F.3d 653, 659 (6th Cir.) (proximate cause is an essential element of a claim alleging a constitutional violation), cert. denied, 513 U.S. 873 (1994)).

Second, by virtue of having requested the Franchise Ordinance, participated in its drafting, and accepted its terms and benefits, the plaintiffs are estopped from challenging its validity. "It is well established that the acceptance of benefits under a[n]. . . ordinance precludes an attack on it." Goforth Props. v. Town of Chapel Hill, 323 S.E.2d 427, 429 (N.C. Ct. App. 1984). Thus, just as the plaintiffs have not been injured by the Franchise Ordinance, their acceptance of its benefits forecloses them from challenging it as a matter of law.

Third, if the Court were to declare the existing Franchise Ordinance void, the effect of such a ruling would place the plaintiffs in the position they were in before any Franchise Ordinance had been adopted. See Blades v. City of Raleigh, 187 S.E.2d 35, 46-47 (N.C. 1977) (where ordinance affecting plaintiffs' property is declared void, the property reverts back to the land use status it had

prior to the ordinance's enactment). If that occurred here, the plaintiffs' existing franchise for their LCID and C&D landfills would become void because there would be no ordinance to authorize their franchise, and the plaintiffs' existing State permit for their landfills would likewise become void for lack of having a franchise. N.C. Gen. Stat. § 130A-294(b1)(3); cf. Browning-Ferris, 484 S.E.2d at 413 (noting North Carolina Department of Justice decision that state transfer station permit was void from the time of issuance because it was issued without an appropriate zoning approval letter).

Finally, assuming that the plaintiffs may nevertheless challenge the existing Ordinance in this case, the language stating that "[t]he Town Council. . . may grant a franchise upon terms acceptable to the Town Council" and that "[t]he Town Council may deny a franchise in its sole discretion" is nothing more than an accurate statement of well-established law.

N.C. General Statute § 160A-319(a) authorizes a city "to grant upon reasonable terms" a franchise for, inter alia, solid waste collection and disposal facilities such as a sanitary landfill. See N.C. Gen. Stat. § 160A-311(a). The North Carolina courts have held that, under the franchise-power granted to cities by N.C. General Statute § 160A-319(a), "[t]he power to grant or refuse to grant [a] franchise remains vested solely in the governing body of the City. This power is essentially legislative in nature. . . [and] [i]ts exercise is entirely discretionary." Winston-Salem Cablevision v. City of Winston-Salem, 164 S.E.2d 737, 742 (N.C. Ct. App. 1968); Madison Cablevision v. City of Morganton, 386 S.E.2d 200, 212 (N.C. 1989). Indeed, in Winston-Salem Cablevision, the court rejected the contention by a cablevision that Winston-Salem's Board of Aldermen was "under a positive duty" to grant a franchise for a community antenna television system (CATV) pursuant to a franchise ordinance that provided that "no provision of this ordinance may be deemed or construed as requiring the grant of a franchise when the Board determines that

to do so would not be in the public interest." 164 S.E.2d at 738.[15]

N.C. General Statute § 160A-319 gives the Town more than enough discretion to defeat any claim of entitlement to a landfill franchise. And nothing in the language of N.C. General Statute § 130A-294 changes the Town's "essentially legislative" and "entirely discretionary" power. Subsection (b1)(3) of § 130A-294 specifically invokes General Statute § 160A-319. At the time that the Franchise Ordinance was passed, it stated that " [a] local government shall adopt a franchise ordinance under. . . G. S. 160A-319 prior to the submittal by an applicant for a. . . [State]. . . permit for a sanitary landfill." That language did not require that a municipality adopt an ordinance that authorizes any particular type of landfill that an applicant proposes to operate. Rather, the provision merely confirmed that the adoption of a franchise ordinance is absolutely necessary before the applicant may obtain a state solid waste permit.[16] The wholly discretionary nature of a city's

---

[15]The <u>Cablevision</u> court held that:

> [n]othing in the general law requires that the City either issue, or not issue, one or more CATV franchises to anyone. . . . The adoption by the City of a general ordinance setting forth the procedures for the filing and consideration of applications for CATV franchises did not vest in the Plaintiffs, or in any other applicant, any right which can be enforced by the Court to force the City to grant to the Plaintiffs, or to any other applicant, a CATV franchise. The power to grant or to refuse to grant any such franchise remains vested solely in the governing body of the City. This power is essentially legislative in nature. <u>Monarch Cablevision v. City Council, City of Pacific Grove</u>, 239 Cal.App.2d 206, 48 Cal. Rptr. 550; 12 McQuillin Municipal Corporations, 3rd Ed., 34.22. Its exercise is entirely discretionary. Mandamus does not lie to compel performance of an act which requires the exercise of judgment and discretion on the part of the party against whom enforcement is sought. 5 Strong, N.C. Index 2d, <u>Mandamus</u>, 1, p. 290, et seq. In this case it is not for the Courts of the State but for the Board of Aldermen who are duly elected by the people of Winston-Salem to decide under the law how many, to whom, and under what conditions CATV franchises will be issued in that City.

164 S.E.2d at 742.

[16] This reading is supported in the Court of Appeals decision in <u>County of Wake v. N.C. Department of Environment & Natural Resources</u>, 573 S.E.2d 572 (N.C. Ct. App. 2002). There, in deciding whether under N.C. General Statute § 160A-319 " a franchise is mandatory for the operation of a 'public enterprise,'" the court stated that "a city or town is required to pass an ordinance granting a franchise any time a third party, be it a private individual or corporation, another municipality, or a county, seeks to operate a public utility such as a solid waste disposal facility." 573 S.E.2d at 586. The court did not mean by this statement that any individual or corporation seeking to operate a landfill is entitled as a matter of right to an ordinance granting the particular franchise requested, but only that any individual or corporation seeking to operate a particular type of landfill must first obtain an

legislative decision about this matter is confirmed not only by the reference to N.C. General Statute § 160A-319, but also by subsection (b1)(4) of § 130A-294, which provides that "[t]his subsection shall not be construed to affect the validity of any lawfully adopted franchise . . . ordinance or to affect the responsibility of any person to comply with any lawfully adopted franchise . . . ordinance."

The plaintiffs' reliance upon <u>Bizzell v. Board of Alderman</u>, 135 S.E. 50, 55 (N.C. 1926) and <u>Dobrowolska v. Wall</u>, 530 S.E.2d 590, 600-601 (N.C. Ct. App. 2000) does not undercut this conclusion. <u>Bizzell</u> held that a general police-power ordinance (which prohibited the location and operation of gasoline stations except by the consent of the board of aldermen but permitted the continued operation of stations that had already been constructed), was void because it allowed "the board of aldermen at their pleasure to grant one person a license and refuse another under the same circumstances." 135 S.E. at 55. In this way, the ordinance "[did] not make a general or uniform rule of equal rights to all and applicable to all alike." <u>Id.</u>

<u>Bizzell</u>, however, is inapplicable here because the ordinance in that case was not a franchise ordinance regulating a public utility enterprise. Unlike a general police-power or zoning-power ordinance, which generally must be applied "to all [persons] alike," <u>id.</u>, an ordinance enacted to regulate a public utility enterprise under the franchise power may contain regulations that are exclusive to particular franchisees and inapplicable to the public generally. For example, N.C. General Statute § 153A-316(3) specifically authorizes a county to enact a franchise ordinance that

---

ordinance granting a franchise for that type of landfill. Nothing in the decision suggested that a municipality lacks the legislative discretion to deny a request for a particular franchise altogether. The <u>County of Wake</u> decision went on to hold that even though Wake County, which sought to operate an MSW landfill in the Town of Holly Springs, did not obtain a franchise from                              the Town, the Town was equitably estopped from contending that a franchise was required because the Town repeatedly had ratified its approval of the County's proposed landfill through a series of inter-local agreements and a formal resolution granting prior approval for the issuance of a State permit for the landfill. In this case, the plaintiffs' pleadings do not allege any equitable estoppel claim; and, in any event, the Town took no action to ratify any approval of the plaintiffs' proposed industrial solid waste landfill by resolution, agreement, or otherwise.

grants a franchise for a sanitary landfill "to one or more persons for the exclusive right to commercially collect or dispose of solid wastes within all or a defined portion of the county and prohibit any other person from commercially collecting or disposing of solid wastes in that area." This same power is implied under N.C. General Statute § 160A-319(a) for cities. See Duke Power Co., 117 S.E.2d at 817 (holding that, for cities, "[t]he sovereign right to franchise implies the power to control for public benefit, including among other things, the right to fix reasonable rates and to specify where the franchise may or may not be exercised so as to afford adequate service to the public."). In sum, a franchise is "[a] special privilege conferred by [a] government on [an] individual or corporation," Shaw, 152 S.E.2d at 145; and it is precisely this special nature of a franchise that renders a city's power to grant or to deny one as being "entirely discretionary," Winston-Salem Cablevision, 164 S.E.2d at 742; Madison Cablevision, 386 S.E.2d at 212. Thus, the language in the instant Franchise Ordinance that "[t]he Town Council may deny a franchise in its sole discretion" is not unconstitutional under the principles enunciated in cases like Bizzell, which had nothing to do with the validity of a franchise ordinance.

E.    **The Court Denies the Plaintiff's Request for Specific Relief**

For the aforementioned reasons, the Court will deny the plaintiffs' request for specific relief.


**IV. CONCLUSION AND ORDER**

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    Defendant's Motion for Summary Judgment (Doc. No. 46) be **GRANTED** and Plaintiffs' Motion for Summary Judgment (Doc. No. 43) be **DENIED**;

2.    Counts One, Three, Four, Five are **DISMISSED**.

Signed: March 11, 2008

Robert J. Conrad, Jr.
Chief United States District Judge